# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BRYAN ANDERSON,<br><br>        Plaintiff,<br><br>        v.<br><br>MAGELLAN HEALTH, INC., STEVEN J. SHULMAN, SWATI ABBOTT, CHRISTOPHER J. CHEN, KENNETH J. FASOLA, PETER A. FELD, MURAL R. JOSEPHSON, G. SCOTT MACKENZIE, LESLIE V. NORWAL, and GUY P. SANSONE,<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  C.A. No. 2021-0202-KSJM |

## OPINION

Date Submitted: February 17, 2023
Date Decided: July 6, 2023

Ryan M. Ernst, BIELLI & KLAUDER, LLC, Wilmington, Delaware; Michael A. Rogovin, WEISS LAW, Atlanta, Georgia; *Counsel for Plaintiff Bryan Anderson*.

Paul J. Lockwood, Arthur R. Bookout, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Magellan Health, Inc., Steven J. Shulman, Swati Abbott, Christopher J. Chen, Kenneth J. Fasola, Peter A. Feld, Mural R. Josephson, G. Scott MacKenzie, Leslie V. Norwal, and Guy P. Sansone*.

Anthony A. Rickey, MARGRAVE LAW LLC, Wilmington, Delaware; *Counsel for Amici Curiae Law Professors Sean J. Griffith and Minor Myers*.

**McCORMICK, C.**

The plaintiff filed this stockholder class action challenging the merger agreement dated January 4, 2021, by which Centene Corporation agreed to acquire Magellan Health, Inc. Magellan had conducted a sale process in 2019 separate from the negotiations that led to the Centene deal. As part of the 2019 process, 24 prospective bidders entered confidentiality agreements containing "don't ask, don't waive" provisions. In this suit, the plaintiff claimed that the don't-ask-don't-waive provisions impeded the process that led to the Centene deal and, because the provisions were not fully described in the proxy, rendered stockholder disclosures materially deficient. Shortly after the plaintiff filed this suit, Magellan issued supplemental disclosures providing further detail on the don't-ask-don't-waive provisions. Magellan also waived its rights under three of the four confidentiality agreements in effect at the time of the supplemental disclosures. The plaintiff agreed that these actions mooted his claims and stipulated to dismissal.

On the theory that the supplemental disclosures and waivers were corporate benefits, the plaintiff's counsel petitioned the court for an award of $1,100,000 in attorneys' fees and expenses. Magellan argued in opposition that the benefits achieved were nominal, warranting fees in the range of $75,000 to $125,000. Through a short bench ruling delivered on June 6, 2023, the court awarded $75,000 in fees and expenses.

The eye-popping request for $1,100,000 caught the attention of the academic community, and two professors well known to this court served as *amici curiae* to advocate for reform in this court's approach to mootness fee petitions. The professors urged that this court issue a written decision to warn other courts applying Delaware law of these

policy dangers, and they made good points.  Hence, this decision sets out the reasoning behind the bench ruling.

## I.  FACTUAL BACKGROUND

The facts are drawn from the pleadings and the record before the court, which includes the Complaint and exhibits submitted with the parties' briefing on the fee petition.[1]

### A.  The Merger Agreement

Magellan is a managed healthcare provider that focuses on special populations, complete pharmacy benefits, and other specialty healthcare areas.  Centene is a publicly traded healthcare company that provides programs and services to uninsured and under-insured people in the United States.

In late 2018, Centene expressed interest in acquiring Magellan, and the companies entered into a confidentiality agreement in January 2019.  In March 2019, Magellan's stock price spiked, and Centene decided not to submit an offer.  After Centene stated that it was not interested in a transaction at that time, the Magellan Board of Directors (the "Board") determined to canvas the market.

During March 2019, Magellan's financial advisor contacted potential buyers of Magellan or a Magellan business segment.  That process generated interest from 34 potential acquirers, 24 of whom entered into confidentiality agreements containing don't-ask-don't-waive provisions.  Confidentiality agreements executed by potential acquirers as

---

[1] C.A. No. 2021-0202-KSJM, Docket ("Dkt.") 1 (Compl.); Dkt. 15 ("Ernst Decl.").

part of an auction process typically contain "standstill" provisions that obligate the acquirer to refrain from taking actions that relate to acquisition or control of the target. A don't-ask-don't-waive provision prohibits a potential acquirer from making any public or private requests to waive the standstill restrictions. Each of the confidentiality agreements, including the don't-ask-don't-waive provisions, were in effect for two years from the date of signing.

By the end of March 2019, Magellan had received nine indications of interest. None resulted in an offer to acquire Magellan. One party, Molina Healthcare, Inc., expressed interest in acquiring a Magellan subsidiary, Magellan Complete Care ("MCC"). After diligence, Molina entered into an agreement to acquire MCC dated April 30, 2020.

Centene again proposed acquiring Magellan in May 2020 and diligence followed. On August 9, 2020, Centene stated that it would submit an indication of interest to acquire Magellan for $98 per share—$86 in cash plus a $12-per-share credit for the then-pending sale of MCC. The Board authorized management to continue discussions with Centene in August 2020. In October 2020, Centene submitted a revised offer of $64.50 in cash and $21.50 in a fixed ratio of Centene stock. Centene then raised its offer twice, submitting a best-and-final cash offer of $95 per share on November 1, 2020.

Based on the November 1 proposal, the Board decided to negotiate exclusively with Centene toward a merger agreement. The Board had determined not to conduct a market check after Centene's August 2020 offer. It reaffirmed its decision after the November 1 proposal, reasoning that the 2019 process supplied sufficient information concerning the interest (or lack of interest) from other potential bidders.

3

The MCC acquisition closed on December 31, 2020. Magellan and Centene executed the merger agreement on January 4, 2021. At that time, six of the confidentiality agreements from March 2019 remained in effect, and five of those contained don't-ask-don't-waive provisions.

Magellan scheduled a stockholder vote to approve the acquisition for March 31, 2021, and issued a proxy statement (the "Proxy") on February 19, 2021.

**B.     This Litigation**

Plaintiff Bryan Anderson owns stock in Magellan. On March 9, 2021, he filed this lawsuit, moved for expedited proceedings, and sought to enjoin the stockholder vote and merger. He alleged that the remaining five confidentiality agreements containing don't-ask-don't-waive provisions tainted the sale process. One of the five of those confidentiality agreements expired two days later, on March 11. Anderson's motion for a preliminary injunction was slightly over a single page and was never prosecuted or briefed.

**C.     Defendants Moot This Litigation.**

Ten days after filing suit and without discovery, on March 19, 2021, Anderson agreed to dismiss his lawsuit as moot in exchange for Magellan waiving some of the remaining don't-ask-don't-waive provisions and issuing supplemental disclosures. Specifically, Magellan agreed to waive the don't-ask-don't-waive provisions in confidentiality agreements with three anonymous companies, Companies A, B, and C (the "Waivers"). The fourth remaining agreement was with Molina, and the Board determined

4

that maintaining the agreement was in Magellan's best interest.[2]  The supplemental disclosures (the "Supplemental Disclosures"), which Anderson's counsel reviewed and approved, advised stockholders about the history and terms of the don't-ask-don't-waive provisions, the purpose of those provisions, and the Waivers.

On March 19, 2021, Magellan published the Supplemental Disclosures in a Form 8-K filed with the SEC.  No other bidder emerged.  Magellan stockholders approved the merger on March 31, 2021.

On July 2, 2021, the parties stipulated to dismiss this action, and the court retained jurisdiction to hear a petition for fees and expenses.  The parties were unable to agree on an amount of mootness fees, and Anderson's counsel ("Movants") moved for an award of fees and expenses.  The parties briefed the motion, and the court heard oral argument on February 17, 2023.[3]

On February 17, 2023, after oral argument on the pending motion and with leave of the court, Professors Sean J. Griffith and Minor Myers (the "Professors") filed a brief as *amici curiae* addressing policy concerns raised by Movants' petition.

II.    **LEGAL ANALYSIS**

Movants sought an all-in fee and expense award of $1,100,000.  Magellan objected and argued that an award in the range of $75,000 and $125,000 was warranted.  Magellan also requested a declaration from the court that the fee award fully compensates each of

---

[2] Ernst Decl. Ex. B at 3.

[3] *See* Dkt. 15 ("Movants' Opening Br."); Dkt. 19 ("Magellan's Opposition"); Dkt. 20 ("Movants' Reply Br.").

the plaintiff's counsel who appeared in this matter. The Professors joined Magellan's request and argued for policy-based reforms to this court's mootness fee jurisprudence. As discussed above, the court granted Magellan's requested relief in a very short bench ruling delivered on June 6, 2023. This decision explains that outcome in three parts, addressing: the fee dispute; the request for a declaratory judgment; and the Professors' policy arguments.

## A. The Fee Dispute

"Delaware courts award fees to plaintiffs' counsel for the beneficial results they produced for the defendant corporation 'even without a favorable adjudication.'"[4] As a policy matter, awarding mootness fees "prevent[s] frustration of the remedial policy of providing professional compensation for such suits when meritorious[,]" thus, ensuring that "even without a favorable adjudication, counsel will be compensated for the beneficial results they produced[.]"[5] The corporate benefit doctrine allows plaintiffs to be reimbursed for fees and expenses where: "(1) the suit was meritorious when filed; (2) the defendants took an action that produced a corporate benefit before the plaintiffs obtained a judicial resolution; and (3) the suit and the corporate benefit were causally related."[6] In addition

---

[4] *Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *4 (Del. Ch. Dec. 27, 2022) (quoting *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980)).

[5] *Baron*, 413 A.2d at 878.

[6] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 432 (Del. 2012).

to determining a movant's entitlement to a mootness fee, the court "must make an independent determination of reasonableness" of the amount requested.[7]

Magellan argues that the amount requested in this case is unreasonable because the benefits achieved by mooting the lawsuit were insignificant. In advancing this argument, Magellan indirectly attacks the merits of Anderson's claims. Magellan does not dispute the other two elements—that the mooting actions occurred before the case was resolved and that the lawsuit caused those actions.

To assess the reasonableness of a fee award, this court follows the *Sugarland* factors.[8] Those factors are:

> (i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation; (iii) the standing and ability of petitioning counsel; (iv) the contingent nature of the litigation; (v) the stage at which the litigation ended; (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred.[9]

Of these seven factors, the primary consideration is the benefit achieved. As this court has held, "[i]n determining the size of an award of attorneys' fees, courts assign the greatest weight to the benefit achieved in light of the nature of the claims and the likelihood

---

[7] *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1046 (Del. 1996).

[8] *Sugarland Indus. v. Thomas*, 420 A.2d 142 (Del. 1980).

[9] *In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005) (discussing *Sugarland*, 420 A.3d at 149–150); *see also Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

of success on the merits."[10]  "Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case."[11]

### 1. The Primary *Sugarland* Factor

Movants touted two categories of corporate benefits warranting attorneys' fees—the Waivers and the Supplemental Disclosures, relying chiefly on the supposed benefits created by the Waivers to justify their fee request.

### a. The Waivers

This court has recognized a corporate benefit when stockholder representatives loosen deal protections such as don't-ask-don't-waive provisions.[12]  "As a theoretical matter, loosening deal protection devices makes topping bids more likely."[13]  The "benefits conferred by" attorney actions that "provide[] the opportunity for a topping bid" "do not vary depending on whether or not a topping bid actually emerge[s]."[14]  Don't-ask-don't-waive provisions are intended to induce sale-process participants to submit their best-and-final bids before the metaphorical gavel drops.  After the gavel drops, however, don't-ask-

---

[10] *Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011) (internal quotation marks omitted).

[11] *Id.*

[12] *See, e.g.*, *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523, at *21–24 (Del. Ch. Dec. 9, 2011); *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *14 (Del. Ch. June 27, 2011).

[13] *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *30 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part*, 59 A.3d 418, 423 (Del. 2012).

[14] *Del Monte*, 2011 WL 2535256, at *14.

don't-waive provisions operate as a form of deal protection for the winning bidder by preventing auction participants from seeking leave to rebid. When combined with other deal protection measures, don't-ask-don't-waive provisions can "collectively operate to ensure an informational vacuum" about other bidders' willingness to pay.[15]

Movants base their fee request on *Compellent* and four precedent decisions awarding sizeable fees for a challenge to don't-ask-don't-waive standstill restrictions.[16] But neither *Compellent* nor the other four decisions support Movants' requested fee.

Movants misapply *Compellent*. There, the plaintiffs' counsel sought a fee of $6 million for causing the defendants to modify deal protections and issue supplemental disclosures. Among other things, the modifications caused the defendants to reduce a termination fee from $37 million to $31 million.[17] As part of the justification for its fee request, the plaintiffs' counsel claimed a dollar-for-dollar benefit of $6 million based on the reduction of the termination fee.

Vice Chancellor Laster rejected the plaintiffs' counsel's approach to valuing the benefits achieved. Instead of the dollar-for-dollar approach, he defined the value of modifications to deal protections "as a function of the incremental amount that stockholders would receive if a higher bid emerged times the probability of the higher bid."[18] He further stated that "the plaintiffs only can take credit for the *increased* likelihood

---

[15] *Celera*, 2012 WL 1020471, at *21.

[16] *See* Movants' Opening Br. at 23–26.

[17] *Compellent*, 2011 WL 6382523, at *17.

[18] *Id.* at *20.

of a topating bid" caused by the loosed deal protections.[19]  To quantify this value, the Vice Chancellor drew upon expert testimony concerning the increased likelihood of a topping bid due to the loosened deal protections, the expected value of a topping bid, and the percentage of the benefit to which counsel was entitled.[20]  Based on this evidence, he calculated an increased likelihood of a topping bid at 8% and an increased stockholder value of 11.37%.  The Vice Chancellor then determined that the plaintiffs' counsel was entitled to 25% of the benefit conferred to the class based on the fee ranges established by Delaware precedent, which tie the amount of fees to the procedural stage at which the case was resolved.[21]  Putting it all together, the Vice Chancellor computed a $2.3 million fee for the loosened deal protections.[22]

Drawing on *Compellent* with the force of muggle magic, Movants cite to a single online study concerning 1,186 "friendly cash transactions" between 2005 and 2016.[23]

---

[19] *Id.* at *24 (emphasis added).

[20] *See id.* at *21–25.

[21] *See id.* at *25 (citing *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *3 (Del. Ch. Mar. 28, 2011)); *see also Ams. Mining*, 51 A.3d at 1259–60 (explaining that, where the case settles early, the Court of Chancery has historically awarded "10–15% of the monetary benefit conferred," that "[w]hen a case settles after the plaintiffs have engaged in meaningful litigation efforts, . . . fee awards in the Court of Chancery range from 15–25% of the monetary benefit conferred," and that 33% is the highest end of the range).

[22] Although the directional thrust of *Compellent* was to discount the benefits that plaintiffs' lawyers claim, the facts of *Compellent* involved an extraordinarily locked-up deal where the plaintiffs obtained a package of changes that substantially increased the likelihood of a topping bid.  For that reason, the method used in *Compellent* on the facts of the case generated a large fee.

[23] *See* Movants' Opening Br. at 24 n.74; *see also* Ernst Decl. Ex. H.

10

Because 43 of these 1,186 transactions received a topping bid, Movants calculate a likelihood of a topping bid of 3.6%.[24] Movants estimate a mean topping bid premium of 8.8% based on the same data set. The result is an $8.36 per-share increase over the $95 per share deal price for a topping deal value of $217,069,289.36.[25] Multiplying this figure by 3.6% yields a benefit of approximately $7.8 million. Applying a 15% fee rate based on precedent fee ranges, Movants calculate an award of approximately $1,172,000 in fees for the Waivers.[26]

Even assuming the sole data source on which Movants rely is sound, Movants' computations skip an important step in the *Compellent* analysis—the qualitative evaluation of the increased likelihood of a topping bid *due to the plaintiff's efforts*. That is, *Compellent* instructs that Movants are only entitled to a fee based on the incremental value provided. For example, if the likelihood of a topping bid was 2.6% before the Waivers, Movants could take credit for the 1% increase, resulting in a fee award of approximately $325,000. Rather than attempt to compute the increased likelihood (if any) of a topping bid generated by the Waivers, Movants take full credit for the total 3.6%.

A qualitative evaluation of the Waivers demonstrates that they were not designed to increase the likelihood of a topping bid. Unlike in *Compellent*, the suite of altered terms here are limited to don't-ask-don't-waive provisions. By waiving those provisions,

---

[24] *See* Movants' Opening Br. at 25–26 (43 divided by 1,186 is 3.6%).

[25] *Id.* at 25.

[26] *Id.* at 25–26.

Magellan added exactly three more potential bidders to the mix. These were not unknown parties, and so the likelihood of a topping bid requires some evaluation of the three affected bidders. None of them expressed any serious interest in Magellan. Company B dropped out of the 2019 process early. Company C was only ever interested in purchasing a single part of one of Magellan's business segments.[27] And even were Company A an interested bidder, the Waiver shortened the effect of the don't-ask-don't-waive provision by only a day. Taking all of this into consideration, the increased likelihood of a topping bid was close to zero. The resulting equation is lawyer-friendly: zero multiplied by anything is zero. So, the Waivers do not justify a fee award.[28]

Beyond *Compellent*, Movants appeal to precedent decisions awarding sizeable fees in actions challenging don't-ask-don't-waive provisions. This is another theoretically sound approach to valuing fee awards for non-monetary benefits. This court has long recognized that "[p]recedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike."[29] Once again, however, Movants misapply

---

[27] Ernst Decl. Ex. B at 3.

[28] Movants exaggerate their achievement by describing the three bidders affected by the Waivers as "three of the *most likely* potential bidders for Magellan." Movants' Opening Br. at 16 (emphasis added). The only support for this contention, however, is that the counterparties executed confidentiality agreements during the 2019 process. By that criterion, the 24 potential bidders who executed a confidentiality agreement during the 2019 process comprised the universe of "most likely" bidders. By Movants' own logic, therefore, they would be entitled to 3/24 of the benefit they claim.

[29] *Olson*, 2011 WL 704409, at *8.

an otherwise sound theory, because the benefits touted by Movants are not like those achieved in the cases on which Movants rely.

Movants cite to four decisions of this court issued in 2014 or earlier involving fees ranging from $2.2 to $5 million for the resolution of claims challenging don't-ask-don't-waive provisions.[30] Each decision was issued at a time when Delaware courts were still developing their views on don't-ask-don't-waive provisions.[31] Each involved far greater

---

[30] *In re LSI Corp. S'holders Litig.*, C.A. No. 9175-VCN, at 36:24–37:3, 47:13–17 (Del. Ch. June 10, 2014) (TRANSCRIPT) (awarding approximately $2.23 million in combined fees and expenses for supplemental disclosures on merger process and a "clarification" of a don't-ask-don't-waive provision); *In re Ancestry.com Inc. S'holder Litig.*, C.A. No. 7988-CS (Del. Ch. Dec. 12, 2013) (TRANSCRIPT) (approving $4 million in mootness fees as stipulated by the parties where the court had preliminarily enjoined a stockholder vote on a merger pending supplemental disclosures on don't-ask-don't-waive standstills and information regarding the company's investment bank's fairness opinion); *Koehler v. NetSpend Hldgs., Inc.*, C.A. No. 8373-VCG, at 25:8–26:17 (Del. Ch. Dec. 18, 2013) (TRANSCRIPT) (awarding $2.2 million in attorneys' fees for therapeutic benefits including "a lengthening of the [deal] process, a reduction in the deal protection devices, the removal of the don't-ask-don't-waive provisions" in addition to supplemental disclosures addressing the protection devices that were wrongly applied to the bidding process); *Minneapolis Firefighters Relief Ass'n v. Ceridian Corp.*, C.A. No. 2996-CC, at 23:23–24:15 (Del. Ch. Feb. 25, 2008) (awarding $5,140,000 in attorneys' fees for the removal of a walkaway provision in a merger agreement, the waiver of standstill provisions, and disclosures that allowed stockholders to "press the board perhaps to consider alternatives").

[31] *See generally* Peter J. Walsh, Jr., Janine M. Salomone, David B. DiDonato, *Delaware Insider: "Don't Ask, Don't Waive" Standstill Provisions: Impermissible Limitation on Director Fiduciary Obligations or Legitimate, Value-Maximizing Tool?*, 2013 Bus. L. Today 1 (Jan. 2013); Bruce L. Silverstein, Kathaleen St. J. McCormick, Tammy L. Mercer, *Key Decisions of 2012 in Delaware Corporate and Alternative Entity Law*, 14 Del. L. Rev. 1, 11–12 (2013) (discussing the development of don't-ask-don't-waive-related jurisprudence through cases like *Ancestry.com*); *The Fire & Police Pension Fund, San Antonio v. Stanzione*, C.A. No. 10078-VCG at 8:5–8 (Del. Ch. Feb. 25, 2015) (TRANSCRIPT) (recognizing that litigation breaking new ground can generate greater fees than when the case law "becomes more developed" on the same area).

13

effort from the plaintiffs' counsel than Movants invested in this case.[32] And each achieved

far more than Movants achieved here. The cases that Movants cite involved provisions

that largely deterred potential bidders or otherwise contributed to an informational vacuum

regarding third-party bids.[33] By contrast, the Waivers either failed to meaningfully

facilitate offers (as with Company A) or failed to cure an informational vacuum about

potential bids (as with Companies B and C). The cases on which Movants rely do not

inform the value of the Waivers.

Furthermore, any student of Delaware law will notice that the precedent decisions

relied on by Movants predate Chancellor Bouchard's decision in *Trulia*.[34] As discussed in

the next section, *Trulia* and other doctrinal changes in Delaware law adopted around that

---

[32] *See Ancestry.com*, C.A. No. 7988-CS (granting mootness award after substantial discovery, preliminary injunction argument, and additional motion practice); *LSI Corp.*, C.A. No. 9175-VCN (settling after counsel had spent approximately 2,155 hours in pursuit of the action); *NetSpend*, C.A. No. 8373-VCG, at 26:22–23 (settling after arguing a preliminary injunction argument and as part of a "relatively complex litigation"); *Ceridian*, C.A. No. 2996-CC (settling after plaintiffs secured a motion to expedite and after extensive document review).

[33] *See Ancestry.com*, C.A. No. 7988-CS, at 228:1–11 (describing how "[n]one of the board seems to be aware of" how their don't-ask-don't-waive standstill provisions worked, which "probabilistically is a violation of the duty of care" regarding the sale process); *LSI*, C.A. No. 9175-VCN, at 42:7–46:2 (stating that the blend of a matching rights provision and don't-ask-don't-waive provisions created "impediments that a new bidder coming forward might encounter" with the effect of deterring bids); *NetSpend*, 2013 WL 2181518, at *19 (Del. Ch. May 21, 2013) (preliminarily enjoining don't-ask-don't-waive provisions where the company "could not have known with certainty" that entities subject to such provisions "are uninterested" in the company); *Ceridian*, C.A. No. 2996-CC (eliminating the don't-ask-don't-waive aspect of relevant standstill provisions as a settlement condition for a deal in which a rival, interested bidder had emerged, but was contractually prohibited from expressing interest).

[34] *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884 (Del. Ch. 2016).

time dramatically reduced the attractiveness of strike suits challenging M&A transactions in Delaware. One result of this doctrinal shift was an overall decline in settlements and fee awards.[35] This trend renders pre-*Trulia* precedent less useful in determining the value of otherwise comparable benefits. Although members of the Court of Chancery are keenly attuned to this trend, other courts applying Delaware law to price corporate benefits might not have access to the transcripts of this court's bench rulings that evidence the trend. This warning is for their sake: Often, pre-*Trulia* precedent pricing corporate benefits reflect inflated valuations and warrant careful review.

Post-*Trulia* decisions awarding attorneys' fees in suits challenging don't-ask-don't-waive provisions reflect the decline in fees awarded for non-monetary benefits in merger litigation.[36] The Professors identify three decisions from 2016 ordering fees of $275,000, $300,000, and $325,000 for waiving fifteen, nineteen, and six standstills, respectively.[37] The defendants identify a fourth relevant decision, *Williams*, which was issued in the period leading up to *Trulia* when Delaware courts were beginning to clamp down on disclosure-only settlements.[38] In *Williams*, the court awarded a total of $325,000 in fees—$75,000

---

[35] *See* Matthew D. Cain et al., *Mootness Fees*, 72 Vand. L. Rev. 1777, 1791–92 (2019) [hereinafter *Mootness Fees*].

[36] *See id.* at 1802–03.

[37] *See Akerman v. United Online, Inc.*, C.A. No. 12321-VCS (Del. Ch. Oct. 12, 2016) (ORDER); *In re Regado Bios., Inc. S'holder Litig.*, C.A. No. 10606-CB (Del. Ch. July 27, 2016) (TRANSCRIPT); *In re BTU Int'l, Inc. S'holders Litig.*, C.A. No. 10310-CB (Del. Ch. Feb. 18, 2016) (TRANSCRIPT).

[38] *Williams v. Off. Payment Hldgs. Inc.*, C.A. No. 8970-CB (Del. Ch. Feb. 20, 2015) (TRANSCRIPT).

for the loosening of the deal protections and $250,000 for supplemental disclosures.[39]  The plaintiff there secured a waiver of 39 standstills and a three-day extension of the bidding window, which the court priced at $75,000.[40]  This body of precedent is more probative than the cases cited by Movants, and the Waivers pale in comparison to the loosened deal protections achieved in these cases.  The stark comparison to relevant case law confirms that the Waivers had little-to-no value.

### b. The Supplemental Disclosures

Because the Waivers do not justify a fee award, the amount of Movants' fee depends on the value of the Supplemental Disclosures.  This court has recognized that supplemental disclosures can provide a compensable corporate benefit, but the standard for pricing that benefit for the purpose of awarding mootness fees warrants reexamination in view of developments in deal litigation since *Trulia*.

*Trulia* addressed the problem of excessive deal litigation that did not provide value to stockholders.  As has been widely reported, the volume of deal litigation spiked dramatically beginning in 2009, with Delaware attracting most of those suits.[41]  The suits followed a pattern.  Upon the announcement of a deal, stockholder plaintiffs sued for breach of fiduciary duties and sought expedited relief wielding "the threat of an injunction to prevent a transaction from closing" as leverage.[42]  The threat of a preliminary injunction

---

[39] *Id.*

[40] *Id.* at 48:18–20.

[41] *See generally Mootness Fees* at 1779.

[42] *Trulia*, 129 A.3d at 892.

16

was made credible due to the presumptive standards of review—entire fairness or enhanced scrutiny—which enabled a court to reach the merits of a case when assessing claims of fiduciary misconduct.

The defendants' desire to close the deal gave them strong incentives to resolve stockholder suits quickly. The desire to obtain a broad release foreclosing other stockholders from challenging the transaction made settlement an attractive form of resolution. Supplemental disclosures provided the easiest "give" and thus the "most common currency" to procure a settlement.[43] Disclosure-only settlements, therefore, proliferated with the increase in deal litigation.

Delaware courts responded to the problem of excessive deal litigation in multiple ways, foremost by altering the substantive law. In *MFW* and *Corwin*, the Delaware Supreme Court gave transactional planners ways to invoke the business judgment rule to avoid a merits-based review under the entire fairness and enhanced scrutiny standards.[44] In *C & J Energy*, the Delaware Supreme Court reversed this court's decision to preliminarily enjoin deal protections.[45] In reaching this conclusion, the high court reasoned that it was unfair to "strip a third party of its contractual rights while simultaneously binding that party to consummate the transaction."[46] The court expressly denounced the

---

[43] *Id.* at 892–93.

[44] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014); *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[45] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' and Sanitation Empls.' Ret. Trust*, 107 A.3d 1049 (Del. 2014).

[46] *Id*. at 1054.

use of preliminary injunctions as a means for challenging third-party acquisitions and rerouted stockholders to "after-the-fact monetary damages."[47]

Separately, Delaware courts began to view disclosure-only settlements more critically. For years after disclosure-only settlements first came into fashion, Delaware courts approved them based on the argument that the additional disclosures provided a compensable corporate benefit[48] and under the theory that they were effective tools for dispensing of deal litigation before *MFW*, *Corwin*, and *C & J Energy*. Although the supplemental disclosures provided no discernable benefit to stockholders, the resulting attorneys' fees provided meaningful benefits to the plaintiff's attorneys directly involved in the litigation, thereby increasing the attraction of strike suits. Thus, what seemed like a good idea at the time had the unintended effect of powering the upsurge of deal litigation. Recognizing their contribution to the problem, Delaware courts reversed course and began to clamp down on disclosure-only settlements.[49]

---

[47] *Id.* at 1072–73.

[48] *Trulia*, 129 A.3d at 894.

[49] *See, e.g.*, *Acevedo v. Aeroflex Hldg. Corp.*, C.A. No. 9730-VCL, at 62:17–63:6 (Del. Ch. July 8, 2015) (TRANSCRIPT) (rejecting disclosure-only settlement where additional disclosures concerning the lack of fiduciary conflicts were insufficient to support the broad settlement); *In re Riverbed Techs. S'holders Litig.*, 2015 WL 5458041 (Del. Ch. Sept. 17, 2015) (approving a disclosure-only settlement but decreasing the amount of attorneys' fees sought by the plaintiff's counsel); *In re Aruba Networks, Inc. S'holder Litig.*, C.A. No. 10765-VCL (Del. Ch. Oct. 9, 2015) (TRANSCRIPT) (rejecting disclosure-only settlement and dismissing the case with prejudice due to inadequate representation by counsel); *see also* Sean J. Griffith, *Innovation in Disclosure-Based Shareholder Suits*, 69 Case W. Res. L. Rev. 937, 934 (2019) [hereinafter *Innovation*]; *Mootness Fees* at 1788.

Delaware courts' efforts to suppress disclosure-only settlements culminated in *Trulia*, where Chancellor Bouchard announced a new standard. Delaware courts apply a materiality standard when determining whether a plaintiff adequately alleged a disclosure claim under Court of Chancery Rule 12(b)(6).[50] They have also traditionally applied the materiality standard when determining whether a supplemental disclosure provided a fee-justifying benefit.[51] In *Trulia*, however, Chancellor Bouchard announced that he would only approve disclosure-only settlements where the disclosures were "plainly material."[52] Under this formulation of the materiality standard, the issue of materiality should not be "a close call."[53] By creating a defendant-friendly presumption on materiality for disclosure-only settlements in Delaware, *Trulia* effectively ripped out the final page in the nearly empty playbook that the plaintiffs' bar had used in pre-closing deal litigation.[54]

---

[50] *See Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (holding that there is a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action," as when requesting stockholder approval for a merger); *see also Olenik v. Lodzinski*, 208 A.3d 704, 719 (Del. 2019) (applying materiality test when determining whether vote was sufficient informed to warrant application of the business judgment standard under *MFW*); *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (applying materiality test when determining whether vote was sufficient informed to warrant application of the business judgment standard under *Corwin*).

[51] *See In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1127 (Del. Ch. 2011) (holding that "[f]or a disclosure claim to . . . provide a compensable benefit to stockholders, the supplemental disclosure that was sought and obtained must be material").

[52] 129 A.3d at 898.

[53] *Id.*

[54] *See* Robert S. Reder, Lauren Messonnier Meyers, *Delaware Chancery Court Resets The Rules Of The Road For Disclosure-Only Settlements*, 69 Vand. L. Rev. En Banc 41, 50 (2016); *Mootness Fees* at 1787–88; *Innovation* at 934; Ryan Lewis, *What Happens in Delaware Need Not Stay in Delaware: How* Trulia *Can Strengthen Private Enforcement of the Federal Securities Laws*, 2017 B.Y.U. L. Rev. 715, 741 (2017).

With the awareness that Delaware courts cannot foreclose the plaintiffs' bar from pursuing disclosure claims, *Trulia* identified mootness proceedings as a "preferred" path for resolving them.[55] Settlement proceedings are largely non-adversarial because the parties have a shared goal of securing court approval. This places the court at a disadvantage when valuing the benefit of the settlement consideration for the purpose of awarding attorneys' fees. By contrast, after defendants moot claims, "defendants are incentivized to oppose fee requests they view as excessive" because "securing a release is not at issue."[56] This adversarial aspect of mootness proceedings serves as a bulwark against excessive fees. Delaware law also requires notice of fees to allow a stockholder to challenge the fee payment as wasteful if circumstances warrant.[57] These aspects of mootness proceedings led Chancellor Bouchard to conclude that they were a preferable mechanism for resolving disclosure disputes relative to settlements.

A few months after *Trulia*, this court in *Xoom* addressed what was then an open question—whether this court should apply the "plainly material" standard when evaluating a petition for mootness fees based on the issuance of supplemental disclosures.[58] The court rejected the defendants' efforts to invoke the *Trulia* standard and went a step further to ratchet down the standard from "material" to "helpful."[59] The court held that, in the

---

[55] *Trulia*, 129 A.3d at 897.

[56] *Id.* at 896–97.

[57] *Id.* at 898; *see also In re Advanced Mammography Sys., Inc. S'holders Litig.*, 1996 WL 633409, at *1 (Del. Ch. Oct. 30, 1996).

[58] *In re Xoom Corp. S'holder Litig.*, 2016 WL 4146425 (Del. Ch. Aug. 4, 2016).

[59] *Id.* at *3.

20

mootness context, "a fee can be awarded if the disclosure provides some benefit to stockholders, whether or not material to the vote."[60]

The lower standard applied in *Xoom* had pros and cons. Helpfully, it allowed courts to avoid assessing the legal viability of disclosure challenges each time a mootness fee is disputed. As traditionally articulated, a claim must be meritorious when filed to support a mootness fee,[61] which has been interpreted to mean that the claim must meet the pleading standard of Rule 12(b)(6).[62] By contrast, at least one line of cases has held that a claim need not be meritorious to support a court-approved settlement.[63] By altering the standard for obtaining mootness fees for supplemental disclosures to "helpful," *Xoom* aligned the standard with that applicable in some settlement contexts, and also eliminated the need for

---

[60] *Id.*

[61] *EMAK*, 50 A.3d at 432.

[62] *Boxed*, 2022 WL 17959766, at *4 ("A claim is meritorious when made if capable of surviving a motion to dismiss and the plaintiff has knowledge of 'provable facts' that provide a 'reasonable likelihood of ultimate success.'" (quoting *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966))); *see also Baron*, 395 A.2d at 380 (deploying the same standard).

[63] *See In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 634–35 (Del. 2005) (approving a settlement and observing that "there is no requirement that the court deny approval of a settlement if it concludes that the claims to be released could not withstand a motion to dismiss," "the weakness of the claims to be released is factored into the court's analysis of the fairness and reasonableness of the settlement," and "there is no just reason to disapprove settlements in cases where the class is being treated fairly simply because it is arguable that the class possesses no viable claims at all"); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1044 (Del. Ch. 2015) ("Under controlling Delaware Supreme Court precedent, a settlement can release claims of negligible value to achieve a settlement that provides reasonable consideration for meaningful claims").

the court to run Rule 12(b)(6) analyses on materiality to resolve a mootness fee petition. This reduces strain on judicial and litigant resources.

The tradeoff of the *Xoom* standard is that it created a risk that plaintiffs' counsel would pursue weak disclosure claims with the expectation that the defendants would rationally issue supplemental disclosures and pay a modest mootness fee as a cheaper alternative to defending the litigation. In this way, *Xoom* could be construed as encouraging plaintiffs' counsel to pursue meritless claims.[64] For the avoidance of doubt, Delaware policy does not encourage this conduct.

This court has not had many opportunities to clarify Delaware policy on mootness fees based on supplemental disclosures because, in the wake of *Trulia*, attorneys who specialized in this work began filing elsewhere. The deal-litigation diaspora spread mainly to federal courts, where plaintiffs' attorneys repackaged their claims for breach of the fiduciary duty of disclosure as federal securities claims.[65] The Professors cite a recent Bloomberg Law analysis of federal court cases, which identified almost as many merger challenges in 2021 as in 2017.[66] One group of scholars reported that the federal actions

---

[64] *See Mootness Fees* at 1809 (discussing the *Xoom* standard and arguing that "[i]nformation that is not legally required should not be the basis of a fee award").

[65] *Id.* at 1780; *Innovation* at 945–46; *see also* Sean J. Griffith, *Frequent Filer Shareholder Suits in the Wake of* Trulia*: An Empirical Study*, 2020 Wis. L. Rev. 443, 451 (2020) (reporting data indicating that stockholder suits migrated to federal courts in *Trulia*'s wake, refashioned as federal securities claims).

[66] Profs.' Br. at 4–5 (citing Matthew Bultman, *Individual Merger Suits Replacing Class Action in Strategy Shift*, Bloomberg Law (Oct. 13, 2022, 12:26 PM), https://news.bloomberglaw.com/securities-law/individual-merger-suits-replacing-class-action-in-strategy-shift); *see also Mootness Fees* at 1788 (reporting data showing merger

involved "an increased and distinctive use of mootness dismissals."[67] Although the merger tax resulting from this trend in deal litigation is less expensive than that arising from the system of disclosure-only settlements,[68] it is still a problem. And, although it is not presently a problem in Delaware courts, it continues to plague Delaware corporations.

Given developments in Delaware law and the continued merger tax of deal litigation, a rule that seems to encourage the pursuit of legally meritless disclosure claims does not make sense. At a minimum, mootness fees should be granted for the issuance of supplemental disclosures only where the additional information was legally required.[69] And were Delaware courts to see an uptick in mootness fee petitions for supplemental disclosures, it would be appropriate to respond by adopting the solution of *Trulia* and screen out disclosures that fall short of "plain" materiality.[70]

---

litigation rates of approximately 30–40% pre-*Trulia* in federal court, which shot up after *Trulia* to a high of 92% in 2018).

[67] *Mootness Fees* at 1780 (estimating that mootness fees average $265,000 per case or total annual fees of $23.32 million).

[68] *Id.* at 1804–05.

[69] *See Mootness Fees* at 1809 (making this point to argue for applying the "material" standard for valuing mootness fees based on supplemental disclosures under federal law).

[70] There are other benefits to the "plainly material" standard. One feature of pre-*Trulia* litigation is that stockholders would use materiality assessments made when approving disclosure-only settlements to argue in future cases that a proxy statement omitted material information. The *Xoom* standard had the potential to eliminate that chain reaction in the context of mootness proceedings by obviating the need for holdings interpreting the materiality standard. The *Trulia* standard offers the same benefit because a court can easily determine, when resolving a mootness fee petition, whether a disclosure was *plainly* material on the facts of the case without creating a risk that the same disclosure might not be deemed material under other circumstances.

For these reasons, unless a higher authority proclaims otherwise, this is my last call for *Xoom*. I will award mootness fees based on supplemental disclosures only when the information is material. But because no Delaware court has applied this standard since *Xoom* when evaluating fees for supplemental disclosures in the mootness context, it would be unjust to apply it here. Magellan did not argue for this shift, and Movants did not brief it. The court therefore applies the *Xoom* standard to assess the value of the Supplemental Disclosures.

The Supplemental Disclosures are marginally helpful. The Supplemental Disclosures included:

- Additional discussion of the standstill provisions Magellan entered in March 2019, how the don't-ask-don't-waive provisions worked, and why Magellan entered into them;[71]

- Discussion of the February 2020 extension of three confidentiality agreements with parties interested in MCC;[72]

- A summary of the status of the six standstill agreements in effect as of the date of the merger agreement along with an explanation for why Magellan decided to waive three of them.[73]

The Proxy stated that 24 of the 34 parties expressing interest in Magellan "enter[ed] into confidentiality agreements with Magellan," but omitted how many of those

---

[71] Ernst Decl. Ex. B at 3 ("The Company's purpose in entering into the standstill provisions was to incent each counterparty to participate in the Company's sale process and elicit the highest potential price that such third party would be willing to offer to engage in a transaction involving the Company.").

[72] *Id.*

[73] *Id.*

agreements contained don't-ask-don't-waive standstill provisions.[74]  The Supplemental Disclosures provided this information.  The Proxy states that six standstill provisions were in effect when the Board entered the merger agreement, five of which included don't-ask-don't-waive provisions.[75]  The Proxy goes on to state, however, that the Board believed there was "sufficient time for a third party to make a superior proposal to acquire Magellan if it desires to do so[.]"[76]  The Supplemental Disclosures clarified that three potential bidders could not actually make a superior proposal before the Waivers due to timing.

Taken together, the Supplemental Disclosures provided a more easy-to-read summary of the existence, terms, and operation of the standstills, including why Magellan did not believe that certain of its standstill obligations impeded the sale process.

The parties did not meaningfully brief precedent awards concerning the value of the Supplemental Disclosures.  Movants again rely on pre-*Trulia* precedent for disclosures relating to don't-ask-don't-waive provisions, but that precedent is uninformative for the reasons discussed above.[77]  Magellan argues that the disclosures are worth "nothing" and that they effectively "double count" any value provided by the Waivers,[78] but the

---

[74] *See* Ernst Decl. Ex. A (Proxy) at 30.

[75] *Id.* at 45.

[76] *See* Movants' Reply Br. at 4 (citing *id.*).

[77] *See* Movants' Opening Br. at 22–23 (citing *Ancestry.com*, C.A. No. 7988-CS; *NetSpend*, C.A. No. 8373-VCG; *Compellent*, 2011 WL 6382523; *LSI*, C.A. No. 9175-VCN; *Ceridian*, C.A. No. 2996-CS); Movants' Reply Br. at 6–7 (citing *Williams*, C.A. No. 8970-CB; *Sauer-Danfoss*, 65 A.3d at 1138).

[78] Magellan's Opposition ¶ 22 (citing *Williams*, C.A. No. 8970-CB, at 29:11–30:15 (counsel for defendants)).

Supplemental Disclosures were helpful in ways that the Waivers were not. Under the *Xoom* standard, a modest fee award based on the Supplemental Disclosures is therefore appropriate.

Given the parties' limited briefing on the value of the Supplemental Disclosures, the court turns to other points of reference to value the fee award. Magellan does not oppose a fee award in the range of $75,000 to $125,000.[79] This range overlaps with the $50,000 to $150,000 range of mootness fees commonly negotiated in federal litigation, according to one post-*Trulia* academic survey.[80] And this range is consistent with the limited set of court-ordered mootness fees awards post-*Trulia*. Exceptional circumstances aside,[81] this

---

[79] Magellan's Opposition ¶ 31.

[80] *Mootness Fees* at 1803.

[81] *See Indiana Elec. Workers Pension Trust Fund, IBEW v. Covetrus, Inc.*, C.A. No. 2020-0923-PAF (Del. Ch. June 15, 2021) (TRANSCRIPT) (awarding $600,000 for supplemental disclosures). In *Covetrus*, the company sold $250 million of convertible preferred stock to a third party, who as a result would hold approximately 25% of the voting power in Covetrus. Granting 25% voting power in one step would have required a prior stockholder vote under NASDAQ rules, which define securities issuances of over 20% of the company's voting power as change-in-control transactions. To defer the vote in a manner consistent with NASDAQ rules, the company capped the purchasers' voting interest at 19.99% until the deal received the requisite stockholder approval. Before the stockholder vote, however, Covetrus did not meaningfully disclose the 19.99% cap to stockholders, which left stockholders assuming the deal was "already heavily weighted one way." *Id.* at 64:2–3. The plaintiff caused Covetrus to disclose the 19.99% cap and thus potentially assuage stockholders that the result was not a foregone conclusion. *Id.* at 64:7–16, 69:21–22. These circumstances, and the substantial work invested by the plaintiff's counsel, stand out as exceptional.

26

court has previously noted a post-*Trulia* "high end" of $450,000 for negotiated, material disclosures to guide its assessment of an effective upper bound.[82]

Consistent with these benchmarks, several post-*Trulia* fee awards or agreements have valued marginally helpful supplemental disclosures that contextualize other information disclosed to stockholders at $75,000.[83] It is worth noting that this amount is also consistent with pre-*Trulia* precedent on minimally beneficial disclosures.[84] Although pre-*Trulia* precedent is largely stale for reasons stated previously, the consistency between

---

[82] *See Bednar v. Cleveland Biolabs, Inc.*, C.A. No. 2021-1108-BWD ¶ 8 (Del. Ch. June 13, 2023) (ORDER) (describing a total fee award of $450,000 for a combined set of supplemental disclosures the "high end" of the "negotiated 'going rate' for similar material disclosures post-*Trulia*").

[83] *See, e.g.*, *Rodden v. Bilodeau*, C.A. No. 2019-0176-JRS, at 17:2–10 (Del. Ch. Jan. 27, 2020) (TRANSCRIPT) (granting $75,000 in fees for supplemental disclosures quantifying the financial advisor's service fee, reasoning that there was "some benefit" to these disclosures for "help[ing] . . . stockholders to contextualize the magnitude of Barclays' potential conflicts of interest"); *Gilbert v. Sternberg*, C.A. No. 2022-0185-KSJM (Del. Ch. Dec. 9, 2022) (ORDER) (stipulating to a dismissal for a mootness fee of $150,000 in total, $75,000 for the removal of a challenged bylaw provision that violated Section 228(a) of the DGCL and $75,000 for the related disclosure); *Wilson v. O'Connell*, C.A. No. 2019-1049-JTL (Del. Ch. July 13, 2020) (stipulating to dismissal for a mootness fee of $75,000 in connection with supplemental disclosures considering a purchase agreement and related documents); *In re Rite Aid Corp. S'holders Litig.*, C.A. No. 11663-CB (Del. Ch. May 11, 2016) (stipulating to dismissal for $75,000 for supplemental disclosures); *see also Xoom*, 2016 WL 4146425, at *4–5 (awarding a nominal $50,000 for "helpful" supplemental disclosures); *In re Receptos, Inc. S'holder Litig.*, C.A. No. 11316-CB, at 76:17–21 (Del. Ch. July 21, 2016) (awarding $100,000 for limited material disclosures of "some value").

[84] *See, e.g.*, *Sauer-Danfoss*, 65 A.3d at 1138 (describing a range of $75,000–$80,000 for "minimally beneficial disclosures"); *In re BEA Sys., Inc. S'holders Litig.*, 2009 WL 1931641 (Del. Ch. June 24, 2009) (awarding $81,297 for "unmistakably modest" supplemental disclosures).

the pre- and post-*Trulia* lower bounds provide additional comfort that this decision is consistent with the bulk of decisional authority.

Putting it all together, and with the disclaimer that this judgment call is more art than science, the court holds under the *Xoom* standard that the value of the Supplemental Disclosures is $75,000.

### 2.    The Secondary *Sugarland* Factors

The secondary *Sugarland* factors confirm the propriety of the fee award.  Starting with the positives, Movants did take this action on a contingent basis, which weighs in favor of a fee.  And Movants are experienced in practice before this court.

The other *Sugarland* factors are either neutral or negative.  This case was not terribly complex, as disclosures surrounding don't-ask-don't-waive standstills are no longer a groundbreaking topic.  The litigation ended at an exceptionally early stage.  Despite remaining on the court's docket for two years, the litigation terminated almost immediately after it was filed.[85]  The amount of time and effort expended "serves a cross-check on the

---

[85] *See, e.g.*, *In re Triarc Cos., Inc. S'holders Litig.*, 2006 WL 903338, at *2–3 (Del. Ch. Mar. 29, 2006) (awarding a $75,000 award pre-*Trulia* where corrective disclosures were "likely material" but the litigation ended shortly after the pleading stage); *Sauer-Danfoss*, 65 A.3d at 1139 (deciding $75,000 was warranted in part because counsel "filed fast, sat idle, then shifted into settlement mode" without taking "adversarial discovery" and obtaining a "routine" amount of documents for disclosure-only settlements); *Rodden*, C.A. No. 2019-0176-JRS (awarding $75,000 in attorneys' fees for supplemental disclosures in a case that was mooted a month after the complaint was filed); *see also Full Value P'rs, L.P. v. Swiss Helvetia Fund, Inc.*, 2018 WL 2748261, at *7–8 (Del. Ch. June 7, 2018) (awarding $300,000 in attorneys' fees, rather than the plaintiff's counsel's request of $400,000, because "counsel's litigation efforts were modest[,]" and counsel did not "take any depositions or engage in document discovery, and the litigation spanned a mere four months from its initiation").

reasonableness of a fee award."[86] Movants invested 185 hours for a lodestar of approximately $141,000 plus $1,643.50 in expenses. A fee award of $75,000 represents a multiplier of approximately 0.52x, which is reasonable under the circumstances.

## B. The Declaratory Judgment

Magellan requested a declaration that the fee award "fully compensates all of plaintiff's counsel" in this matter, which the court granted in the June 6 bench ruling.[87]

The facts germane to this request are few. On April 8, 2022, former Weiss Law attorney Richard A. Acocelli emailed Magellan's counsel and stated that his new firm, Acocelli Law, PLLC, represents the plaintiff in this matter.[88] When counsel for Magellan expressed confusion, Acocelli stated, "WeissLaw is no longer representing Mr. Anderson in any respect and has no authority to speak for him."[89] Acocelli also stated that he would "be filing whatever notice is appropriate in Chancery shortly."[90] Neither Acocelli nor Acocelli Law, PLLC filed any such notice. On February 8, 2023, Delaware counsel for the plaintiff moved to admit Michael A. Rogovin of Weiss Law *pro hac vice* on his behalf.[91]

---

[86] *Sauer-Danfoss*, 65 A.3d at 1138.

[87] Magellan's Opposition ¶ 2.

[88] *Id.* Ex. 1 at 2.

[89] *Id.* at 1.

[90] *Id.*

[91] Dkt. 25.

As a result of the change in firms and substitution of counsel, there seems to be some confusion over who represents the plaintiff. In this unusual context, Magellan's request for clarity is reasonable. As the court previously ruled in its June 6 bench ruling, the fee award granted to Movants fully compensates anyone claiming to be the plaintiff's counsel in this action.

## C.     Policy Reform

The Professors raise policy concerns and proposals based on empirical research into nationwide litigation trends. As discussed above, in the wake of *Trulia*, plaintiffs' lawyers left the Court of Chancery for other venues so they could continue to file the types of litigation that the Professors refer to as a "merger tax."[92] To counter this trend in non-Delaware fora, the Professors urge three reforms.

First, the Professors ask the court to provide further guidance on how to value don't-ask-don't-waive standstills for non-Delaware courts evaluating mootness fee petitions and stockholder class settlements. They worry that plaintiffs in non-Delaware courts can "employ the Court's jurisprudence to evade *Trulia*'s purpose and justify any settlement or fee"[93] by offering the formula from *Compellent* to judges unfamiliar with the doctrine.[94]

Implicitly, they ask the court to scrap *Compellent* as bad law, but doing so would be ill-advised. The reasoned approach of *Compellent* can serve as a helpful method for assessing the value of a corporate benefit and the attendant fee award for loosened deal

---

[92] Profs.' Br. at 4–5.

[93] *Id.* at 9.

[94] *See id.* at 9–10.

protections. By adjusting the fee award downward based on the probability of a topping bid, the Vice Chancellor tethered the value of loosened deal protections to the possibility of an actual benefit—something anchored in the real world. By establishing a method for valuing certain types of benefits, *Compellent* offers the potential of making fee awards more consistent across the court's docket.[95] There is no reason to eliminate this useful tool from the toolbox.

Alternatively, the Professors ask the court to "set forth a well-defined formula, incorporating all relevant factors"[96] when applying *Compellent* to guide non-Delaware courts. This too is ill-advised. The greatest risk of *Compellent* is that it injects false precision into an imprecise art. As Vice Chancellor Laster cautioned, this court does "not aspire to mathematical exactitude" when calculating attorneys' fees.[97] Movants' manipulation and misapplication of the *Compellent* analysis illustrate this risk. By citing to empirical data and invoking mathematical formulae, Movants create a specter of objective certainty in the $1.1 million request. Rather than anchor the value of the benefits

---

[95] *See Compellent*, 2011 WL 6382523, at *26, 28 (describing the results of the court's calculations as a "baseline fee award").

[96] Profs.' Br. at 11.

[97] *Compellent*, 2011 WL 6382523, at *20 (stating that "[t]he calculation does not aspire to mathematical exactitude[,]" and that it "only serves to help establish an order of magnitude within which this Court can craft an appropriate award"); *see also In re Complete Genomics, Inc. S'holder Litig.*, C.A. No. 7888-VCL, at 55:12–14 (Del. Ch. Nov. 27, 2012) (TRANSCRIPT) (Vice Chancellor Laster stating that "[i]t would be a mistake to believe that [*Compellent*] was some mathematical exercise designed to create a falsely precise result").

in the real world, Movants used a superficial appeal to *Compellent* to conjure a fantasy estimate. Requiring further precision would only magnify the risk of *Compellent*.

The best approach to *Compellent* is common sense and responsible usage. The purpose of the *Compellent* analysis is to provide a downward anchor discounting contingent benefits (such as a topping bid from a reduced termination fee) by the likelihood that they will come to pass. When a *Compellent* analysis is supported by multiple reliable data sources and sound reasoning, a court might find it useful. By contrast, where a *Compellent* analysis magically generates a sizeable award, a court should be skeptical. This case fell in the latter category.

The Professors' second proposal starts from the principle that mootness fees introduce a new peril in merger litigation. In pre-*Trulia* deal litigation, parties would structure disclosure resolutions as settlements subject to both judicial review and notice to stockholders.[98] By contrast, mootness fees require judicial review only when the parties do not agree to the fee amount. In federal lawsuits, plaintiffs are generally not required to disclose mootness fee agreements.[99] Consequently, disclosure resolutions structured as mootness fee awards run the risk of avoiding both judicial and stockholder oversight, giving rise to accountability and transparency problems.

---

[98] *See generally Trulia*, 129 A.3d at 898.

[99] *See Mootness Fees* at 1802–03; *Trulia*, 129 A.3d at 898 (stating that Delaware law generally requires public disclosure of mootness fee agreements to "guard against potential abuses in the private resolution of fee demands for mooted representative actions").

To solve these problems, the Professors recommend that the court reduce fee awards in cases where a stockholder plaintiff seeks fees without having sought class certification, an order establishing a leadership structure, or input from class members.[100] Because Anderson did not do anything of these things, the Professors suggest that the court award fees as a percentage of Anderson's *pro rata* share of the benefit.[101]

Although one can agree with the starting point of the Professors' second proposal—that mootness proceedings introduce new problems in merger litigation—the proposal seems unlikely to solve the problems. If plaintiffs' lawyers must certify the class to get a fee (which would most certainly be granted in the context of a merger case),[102] then they will move for class certification. The court will resolve it. If plaintiffs' lawyers must establish a leadership structure to get a fee (which is only required where more than one complaint has been filed), then they will do so. The court will resolve it. If plaintiffs'

---

[100] *See* Profs.' Br. at 11–12.

[101] *Id.* at 12.

[102] A merger class is, with exception, a classic example of a 'true' class action warranting certification as a non-opt-out class under Court of Chancery Rules 23(b)(1) and (b)(2). *See, e.g.*, *Turner v. Bernstein*, 768 A.2d 24, 40 (Del. Ch. 2000) (certifying stockholder class under Rule 23(b)(1) without opt-out rights); *Noerr v. Greenwood*, 2002 WL 31720734, at *5 (Del. Ch. Nov. 22, 2002) (certifying a stockholder class action and stating that "[w]here a class is certified under Rule 23(b)(1) or (b)(2), there are no mandatory opt out rights, and any final judgment rendered in that case operates as res judicata with respect to the entire class." (internal quotation marks omitted)); *but see Celera*, 59 A.3d at 434–36 (affirming the Court of Chancery's certification of a stockholder class under Rule 23(b)(2) but reversing its decision not to afford opt-out rights, citing due process concerns particular to the facts); *see also* 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.02[c][3], at 12-32 (2d ed. 2022) ("[T]he Court of Chancery has repeatedly certified stockholder class actions pursuant to Rules 23(b)(1) or (b)(2) after a challenged transaction has closed.").

33

lawyers must consult with class members to get a fee (Delaware courts already require disclosure after the fact), then that seems easy enough.[103] Will the court need to probe into the nature of those consultations? It is unclear. Although having to jump through these hoops might make deal litigation marginally less attractive, the actions seem more likely to increase the cost of litigation and the workload of the court than to improve the system.

Perhaps more importantly, the Professors' second proposal could inject procedural inefficiencies where the incentives set by mootness fees operate as intended to generate valuable benefits. The clearest example of a valuable benefit warranting mootness fees is where the defendants abandon a potentially value-destructive transaction because of the stockholder suit.[104] Where a real benefit is achieved, mootness fees prevent injustice "premised on the theory that 'all of the stockholders . . . benefited from plaintiffs' action

---

[103] Vice Chancellor Laster has hinted at another reform worthy of further consideration, recently suggesting that Delaware corporations have the power to include a provision in their certificates of incorporation, but not in their bylaws, that would require a minimum holding threshold for filing a breach of fiduciary duty claim. *See New Enter. Assocs. 14, L.P. v. Rich*, 2023 WL 3195927, at *29 (Del. Ch. May 2, 2023).

[104] *See, e.g., In re Facebook, Inc. Class C Reclassification Litig.* C.A. No. 12286-VCL (Del. Ch. Oct. 24, 2018) (Stipulation and Order of Dismissal) (stipulating to $68.7 million in mootness fees where the defendants withdrew a stock reclassification transaction challenged by the plaintiff); *In re Versum Mat'ls, Inc. S'holder Litig.*, C.A. No. 2019-0206-JTL, at 57:10–58:7, 61:15–22 (Del. Ch. July 16, 2020) (TRANSCRIPT) (awarding $12 million for litigation that removed deal protection devices and ultimately, albeit indirectly, caused an alternative bidder to buy the company for a higher price); *Teamsters Union No. 142 Pension Fund v. Anixter Int'l, Inc.*, C.A. No. 2019-0999-SG (Del. Ch. July 22, 2020) (TRANSCRIPT) (approving stipulated mootness fee of $1 million where litigation caused the board to terminate a merger agreement in favor of a higher-value deal with an alternative bidder); *Hong v. Su*, C.A. No. 10392-VCL (Del. Ch. Mar. 1, 2017) (approving stipulated mootness fees of $55,000 where litigation efforts caused the board to void and rescind restricted stock units awarded to company CEO in violation of the company's stockholder-approved compensation plan).

and should have to share in the costs of achieving that benefit.'"[105] Consistent with the principles underlying mootness fees, the court's focus when valuing them is on the benefit achieved. If the plaintiff has achieved real benefits, the court rewards them. It does not matter if the plaintiff has checked a series of boxes. The court thus declines to impose such prerequisites to mootness fee applications.

As a third and overarching solution, the Professors advocate denying or dramatically reducing Movants' fee request to avoid inadvertently "signal[ing] to other jurisdictions that [its post-*Trulia*] concern over merger litigation has dissipated."[106] The Professors' points on this front are highly persuasive, and the court took them into consideration when setting the fee amount intended to, in Vice Chancellor Glasscock's words, "encourage *wholesome* levels of litigation."[107] Where lawsuits are not worth much, plaintiffs' counsel should not be paid much. In this case, the award represents less than Movants' lodestar, which should send a signal that these sorts of cases are not worth the attorneys' time. Moreover, had Movants been required to meet the materiality standard, it seems unlikely that there would have been any award at all.

---

[105] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997) (quoting *Weinberger v. UOP, Inc.*, 517 A.2d 653, 656 (1986)); *see also Martin v. Harbor Diversified, Inc.*, 2020 WL 568971, at *2 (Del. Ch. Feb. 5, 2020) ("[S]tockholders who benefit from the litigious efforts of another on their behalf should share in the reasonable costs incurred thereby."); *Louisiana State Empls.' Ret. Sys. v. Citrix Sys.*, 2001 WL 1131364, at *4 (Del. Ch. Sept. 19, 2001) ("The basic principle behind this doctrine holds simply that stockholders who benefit from the litigious efforts of another should share in the costs of achieving that benefit.").

[106] Profs.' Br. at 2.

[107] *Xoom*, 2016 WL 4146425, at *5 (emphasis added).

## III. CONCLUSION

As the court previously held, Movants are awarded $75,000 in attorneys' fees. Magellan is entitled to the declaratory judgment that this figure represents the total award for Movants in this case. Movants shall prepare a revised form of order implementing this decision within ten days, providing Magellan at least five days to review the form.